UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

**WILENTZ, GOLDMAN & SPITZER, P.A.**
90 Woodbridge Center Drive
Suite 900, Box 10
Woodbridge, NJ  07095
732-636-8000
DAVID H. STEIN, ESQ.
*Attorneys for Secured Creditor, Bogota Savings Bank*

| | |
|---|---|
| In Re: | Case No.:  25-10977 (VFP) |
| **FORTRESS HOLDINGS, LLC**, | Chapter 11 |
| Debtor. | Hon. Vincent F. Papalia |
| | Hearing Date:  April 24, 2025 at 11:00 a.m. |

**OBJECTION OF BOGOTA SAVINGS BANK TO ADEQUACY OF
DISCLOSURE STATEMENT PURSUANT TO SECTION 1125 OF THE
BANKRUPTCY CODE DESCRIBING CHAPTER 11 PLAN PROPOSED
BY THE DEBTOR-IN-POSSESSION**

Bogota Savings Bank ("Bogota"), by and through its counsel, Wilentz, Goldman & Spitzer, P.A., hereby files this Objection to the Adequacy of the Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code Describing Chapter 11 Plan (the "Disclosure Statement") proposed by the Debtor-in-Possession, Fortress Holdings, LLC (the "Debtor") under Chapter 11, Title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code") and states as follows:

## I.     BACKGROUND

### i.     Introdction

1.     The Debtor's business involves the start-up of a new 80,000 square foot catering facility, which has no operational history, no staff and no banquet manager.  In addition, the Debtor does not have a permanent certificate of occupancy, which must be granted by the Township of Totowa and which has

not yet been issued given that construction at the Debtor's property is incomplete and on-going, including

issues with relocation of utility poles, repairs of sidewalks, augmentation of air handlers, and completion

of all required governmental inspections and third-party approvals - including obtaining certification

from a trusted kosher certification agency authorizing implementation of a separated Kosher kitchen

facility, dishes, flatware, etc.. dedicated for Jewish affairs.  Furthermore, there has yet to be a resolution

of $175,000 of open fines and penalties due and owing by the Debtor to the Township of Totowa for

unpaid Council on Affordable Housing ("COAH") fees in the amount of $135,000 and for unpaid

penalties for stop work orders in the amount of $40,000.00.

2.      In the backdrop of Debtor's failure to timely open its proposed catering business, the

absence of any banquet manager, the lack of bookings going into the future, the lack of operational

reserves by which to begin the process of scheduling affairs, and the lack of qualified staff (including

hosts), a kitchen manager, cooks, wait-staff, servers and a maintenance and a janitorial workforce that

have not been hired, the Debtor has now embarked on the filing of an ill-fated Disclosure Statement.

3.      From the outset, the Disclosure Statement is doomed, given the lack of a comprehensive

business plan; the uncertainty of the economy, as evidenced by the largest downturn of the financial

markets in the last five years; unpredictable government tariffs affecting supply chain costs, including

food, fruits, produce, beverages, supplies and liquor, all of which are used in a catering facility; and the

predictions by most economic prognosticators that the domestic economy has a sixty (60%) percent

chance of slipping into recession in the near future[1]. These are the financial assumptions which the Debtor

will need to overcome in convincing the Court that its unproven business is economically viable and

feasible without the need for further reorganization into the future.

---

[1]   https://www.marketwatch.com/story/jpmorgan-now-says-theres-a-60-chance-of-a-recession-after-tariff-hikes-a130b3e8

4.      Notwithstanding all of the aforementioned difficulties, the Debtor is attempting to commence a business as a luxury provider of catered celebrations and other affairs, while disposable income for brides and other potential clients have most likely evaporated with the sudden crash of the stock market due to the imposition of global tariffs. Given these uncertainties, the Disclosure Statement should not be sent out to creditors without a thorough vetting and without a thorough discussion and disclosure regarding these concerns.

5.      Furthermore, and as more fully set forth below, Bogota is owed in excess of $16 Million from a fully matured loan which came due by its own terms in 2023 and which has been accruing interest pursuant to the terms of the loan documents at a rate of twenty (20%) percent.

6.      Given the absence of capital, income, and a cogent business model, coupled with an uncertain economy with reduced consumer confidence, the Debtor's Plan is inadequate and unrealistic and has no hope of success absent a sale to an experienced and well-capitalized operator and/or implementing refinance, options which the Debtor has not proposed.

### ii.      Relevant Procedural History

7.      On January 30, 2025 (the "Petition Date"), the Debtor filed a voluntary Chapter 11 Petition in the United States Bankruptcy for the District of New Jersey.

8.      No trustee or examiner has been appointed in these proceedings. The Debtor remains a debtor-in-possession and is operating its business pursuant to §§1107 and 1108 of the Bankruptcy Code.

9.      The Debtor is a single asset real estate case pursuant to §§101 (51B) of the Bankruptcy Code, such that the Debtor is primary source of gross income is generated substantially from the ownership and operation of its real estate and the business located thereon.

10.      On March 18, 2025, the Debtor filed the Disclosure Statement (Docket No. 66).  Also on March 18, 2025, the Debtor filed its Plan of Reorganization (the "Plan", Docket No. 67).

11.     On March 21, 2025, the Court entered an Order and Notice on Disclosure Statement (Docket No. 78), setting a hearing date to determine the adequacy of the Disclosure Statement for April 24, 2025 at 11:00 a.m.

12.     On February 10, 2025, the Debtor filed an Adversary Complaint to Determine the Nature, Extent and Validity of Liens Against Debtor's Assets (the "Adversary Proceeding", Docket No. 35). Bogota has been listed as a Defendant in the Adversary Proceeding.

13.     In response to the Adversary Proceeding, on April 2, 2025, Bogota filed a Motion In Lieu of Answer for Summary Judgment against the Debtor in the Adversary Proceeding.

14.     On April 4, 2025, Bogota properly and timely filed its Proof of Claim (Claim No. 6) in the amount of $16,363,366.35 as of the Petition Date. Interest, fees and costs will continue to accrue until the Proof of Claim is indefeasibly satisfied and paid in full.

### iii.     The Secured Loan with Bogota

15.     On August 11, 2021, the Debtor, being indebted to Bogota in the sum of up to $11,000,000.00 (the "Construction Loan"), executed a Mortgage Note (the "Note") of that date to secure that sum.  The Loan was a non-revolving Construction Loan, converting to a Permanent Loan upon satisfaction of certain conversion conditions.

16.     The terms of the Construction Loan included a provision for an escrow of interest (the "Interest Reserve").  Said Interest Reserve has been depleted with a current zero balance.

17.     The Note provided that the term for the Construction Loan (the "Construction Loan Term") would commence on the loan closing date and would end on the first day of the 19th full month thereafter (the "Construction Loan Maturity Date"), at which time the entire principal amount of the Construction Loan, plus unpaid interest, fees, and other amounts and charges payable in connection with the Loan would be due and payable.

4

18.    Notwithstanding the foregoing, the Debtor had the option to extend the Construction Loan Term for a period of six (6) months, interest only, subject to approval by Bogota.

19.    The Note further provided that conversion to the Permanent Loan would be subject to the following conditions (the "Conversion Conditions"):

(a)    Completion of the Project;
(b)    Issuance of an unconditional Final Certificate of Occupancy and submission of a completed as-built survey certified to the Lender;
(c)    A Minimum Debt Service Coverage Ratio ("DSCR") of 1.25% on a pro forma basis for the Permanent Loan Term; and
(d)    A maximum loan-to-value of 65%.

20.    The Note further provided that, from the commencement of the Loan Term, the Debtor would pay interest in arrears on the unpaid principal amount as follows:

(a)    During the construction period, interest shall accrue on the outstanding principal balance of the loan at a rate of Lender's Prime Rate plus 1.625% with a floor of 4.875%.

(b)    The Annual Percentage Rate would be variable and might change each billing cycle.

21.    In addition, the Note provided that the first monthly payment of interest only, plus 1/12 of the annual real estate taxes, would be made on the first day of the first full calendar month following the Construction Loan closing. Thereafter, monthly payments of interest and 1/12 of the annual real estate taxes would be made on the first day of each successive calendar month and applied to interest only for the Construction Term.

22.    The Note further provided that, if the Debtor satisfied the Conversion Conditions, then the Construction Loan would convert to a Permanent Loan on the Construction Loan Maturity Date. In that event, the Debtor would make 60 fixed monthly payments of principal and interest, plus 1/12th of the annual real estate taxes.  Permanent financing interest would accrue

5

on the outstanding principal balance of the Permanent Loan at a rate equal to 5-year FHLBNY

rate plus three percent (3.0%) per annum (the "Interest Rate"), rounded up to the nearest 1/8%,

with a floor of four percent (4.0%).

23.     The Note further provided that, in the event that the Conversion Conditions were

not met, the outstanding principal balance of the Construction Loan, plus all accrued interest and

any other charges outstanding, would be due and payable to Bogota on the Construction Loan

Maturity Date.

24.     The Note further provided that, if Bogota did not receive any monthly payment

within ten (10) days of its due date, then for each such late payment the Debtor would pay a late

charge of eight (8.00%) percent of the unpaid amount.

25.     In addition, the Note provided that, in the event of any default under the Note or

under the loan documents, interest as of the date of default would accrue on the unpaid balance

of the loan at a rate equal to the lesser of twenty (20.00%) percent per annum or the highest rate

permitted by law (the "Default Rate").

26.     Paragraph 13 of the Note provided for the establishment of an Interest Reserve

Account as follows:

> During the term of the loan, Borrower agrees to establish and maintain
> prior to or at closing an Interest Reserve Account with an initial deposit of
> $730,000. During the construction loan term, if and when the Interest
> Reserve Account balance is reduced to $80,000, Borrower shall replenish
> the Interest Reserve Account, as part of Borrower's Equity Contribution,
> in an amount determined by the Bank to be sufficient to cover interest
> payments for the remaining Construction Loan Term.  Monthly payments
> of interest will be debited from the Interest Reserve Account during the
> Construction Period.  Borrower shall also continue to maintain operating
> account #2000050837 for construction advances during the construction
> period. Said account(s) shall be established prior to or at the time of
> closing of the Loan.

27.    As security for the payment of the Note, the Debtor gave a Construction Mortgage

and Security Agreement (the "Mortgage") to Bogota of even date with the Note covering the

property (the "Premises") owned by the Debtor at:

> Address:      555 PREAKNESS AVENUE
> Municipality: TOTOWA
> County & State: PASSAIC, NJ
> Lot & Block:  LOT 2, BLOCK 6
>
> Address:      561 PREAKNESS AVENUE
> Municipality: TOTOWA
> County & State: PASSAIC, NJ
> Lot & Block:  LOT 4, BLOCK 6
>
> Address:      322-324 BERKSHIRE AVENUE
> Municipality: PATERSON/TOTOWA
> County & State: PASSAIC, NJ
> Lot & Block:  LOT 12, BLOCK 6, TOTOWA
> LOT 18, BLOCK 1218, PATERSON

28.    Said Mortgage was duly recorded in the Office of the Clerk of Passaic County on

August 12, 2021, in Book M17358 of Mortgages for said County at Page 45. According to a real

property title search, the Mortgage is secured as a priority first lien on the Premises.

29.    To further secure the Note, the Debtor executed an Absolute Assignment of

Leases and Rents (the "Assignment of Rents") dated of even date with the Note and recorded in

the Office of the Clerk of Passaic County on August 12, 2021 in Book 17358, Page 75.

30.    To further evidence its indebtedness under the Construction Loan, and as

additional security for the payment of the Note, the Debtor granted Bogota a continuing security

interest in and lien upon the Debtor's right, title and interest in all fixtures and articles of the

Debtor then or thereafter attached to or used in connection with, or with the operation of, the

Premises (the "Collateral").

31.     On or about August 12, 2021, Bogota perfected its security interest in the Collateral by recording a UCC-1 Financing Statement (the "County UCC-1") in the Office of the Clerk of Passaic County as File Number 104993, Instrument Number 2021051970.

32.     On or about August 2, 2021, Bogota perfected its security interest in the Collateral by filing a UCC-1 Financing Statement (the "State UCC-1") with the State of New Jersey Department of the Treasury, Division of Revenue & Enterprise Services, Filing Number 55357210.

33.     Also on August 11, 2021, to further induce Bogota to provide the Construction Loan, the Debtor executed a Security Agreement in favor of Bogota (the "Security Agreement").

34.     The Security Agreement granted Bogota a security interest in all of the Debtor's property as described therein, together with all the equipment, parts, appliances, accessions, appurtenances, proceeds and products therefrom presently or thereafter located at the Premises.

35.     Also on August 11, 2021, to further induce Bogota to provide the Construction Loan, the Debtor executed a Construction Loan Agreement in favor of Bogota (the "Construction Loan Agreement").  The Construction Loan is personally guaranteed by Paul Qassis and Majid Krikor (together, the "Guarantors").

36.     The Construction Loan matured by its own terms on March 1, 2023 and the Debtor is in default of its obligations owing to Bogota.  In addition, the Debtor failed to complete construction of the project as required by the Construction Loan documents.

37.     On September 14, 2023, Bogota issued a notice to the Debtor and the Guarantors (the "Default Notice"), advising that the subject loan was in default and that such default was required to be cured by October 14, 2023.

8

        iv.        **Basis for Objection**

38.     As more fully set forth herein, based upon the absence of full and adequate disclosure, the Court should not approve the Disclosure Statement, nor should it allow the Disclosure Statement and Plan to be sent out to creditors given the legal infirmities involving the treatment of Bogota's secured loan, for which the Debtor seeks reinstatement despite the fact that the loan has fully matured and is accruing interest at a rate of twenty (20%) percent per annum.

## II.    LEGAL ARGUMENT

**a.    The Disclosure Statement Should Not be Approved Because it Does Not Contain Adequate Information.**

39.     Proper disclosure is "the pivotal concept in reorganization procedure under the Code." *Oneida Motor Freight, Inc. v. United Jersey Bank (In re Oneida Motor Freight, Inc.),* 848 F.2d 414, 417 (3d Cir. 1988); *In re Crowthers McCall Pattern, Inc.,* 120 B.R. 279, 300 (Bankr. S.D.N.Y. 1990).

40.     "The importance of full disclosure is underlaid by the reliance placed upon the disclosure statement by the creditors and the court. Given this reliance, we cannot overemphasize the debtor's obligation to provide sufficient data to satisfy the Code standard of 'adequate information.'" *In re Oneida Motor Freight, Inc.,* 848 F.2d at 417. "[T]he importance of full and honest disclosure cannot be overstated." *Ryan Opers., G.P. v. Santiam Midwest Lumber Co.,* 81 F.3d 355, 362 (3d Cir. 1996).

41.     In order to receive Bankruptcy Court approval, the disclosure statement must contain "adequate information" about the debtor, the bankruptcy case, and the plan.  11 U.S.C. § 1125(a)(1). Section 1125 of the Bankruptcy Code defines "adequate information" to mean "information of a kind, and in sufficient detail . . . that would enable a hypothetical investor of the relevant class to make an informed judgment about the plan . . . ." 11 U.S.C. § 1125(a)(1).

*See also In re Lower Bucks Hosp.*, 488 B.R. 303, 317 (E.D. Pa. 2013), *aff'd*, 571 F. App'x 139

(3d Cir. 2014); *In re Congoleum Corporation*, 636 B.R. 362, 383 (Bankr. D.N.J., 2022).

42.    Whether a disclosure statement contains "adequate information" is governed by a

flexible standard and is to be determined by the bankruptcy court on a case-by-case basis. *In re*

*Oneida Motor Freight, Inc.,* 848 F.2d at 417; In *re River Village Assocs.,* 181 B.R. 795, 804 (E.D.

Pa. 1995). "What constitutes 'adequate information' is determined on a case-by-case basis, with

the ultimate determination within the discretion of the bankruptcy court." *In re Lower Bucks*

*Hosp.*, 488 B.R. at 317 (citing *In re Texas Extrusion Corp*., 844 F.2d 1142, 1156–57 (5th

Cir.1988)); *In re Congoleum Corporation*, 636 B.R. 362, 383 (Bankr. D.N.J., 2022).

43.    The "adequate information" standard requires a plan proponent to include in a

disclosure statement all information that would enable holders of claims to take an informed

position on the proposed reorganization plan. *Sure-Snap Corp. v. State Street Bank & Trust Co.,*

948 F.2d 869, 873 (2d Cir. 1991).

44.    "Generally, a disclosure statement must contain all pertinent information bearing

on the success or failure of the proposals in the plan of reorganization." *In re Cardinal*

*Congregate I,* 121 B.R. 760, 765 (Bankr. S.D. Ohio 1990); *In re Stanley Hotel, Inc.,* 13 Bankr.

926, 929 (Bankr. D. Colo. 1981). "A disclosure statement should likewise contain all material

information relating to the risks posed to creditors and equity interest holders under the proposed

plan of reorganization." Id. at 765. "The disclosure statement must contain information that is

material, important and necessary for creditors and shareholders to properly evaluate a proposed

plan and thus enable the creditors and shareholders to make a reasonably informed decision on

the plan." *In re William F. Gable Co.,* 10 B.R. 248, 249 (Bankr. N.D. W. Va. 1981).

45. "A plan is necessarily predicated on knowledge of the assets and liabilities being dealt with and on factually supported expectations as to the future course of the business. . . ." *Century Glove, Inc. v. First Am. Bank of N.Y.,* 860 F.2d 94, 100 (3d Cir. 1988) (internal quotation marks omitted).

46. Moreover, courts have set forth a non-exclusive list of the type of information which should be included in a disclosure statement:

    a. The circumstances that gave rise to the filing of the bankruptcy petition;

    b. A complete description of the available assets and their value;

    c. The anticipated future of the debtor;

    d. The source of the information provided in the disclosure statement;

    e. The condition and performance of the debtor while in Chapter 11;

    f. Information regarding claims against the estate;

    g. A liquidation analysis setting forth the estimated return that creditors would receive under Chapter 7;

    h. The accounting and valuation methods used to produce the financial information in the disclosure statement;

    i. Information regarding the future management of the debtor, including the amount of compensation to be paid to any insider, directors, and/or officers of the debtor;

    j. A summary of the plan of reorganization;

    k. The collectability of any accounts receivable;

    l. Any financial information, valuations or pro forma projections that would be relevant to creditors' determinations of whether to accept or reject the plan;

    m. Information relevant to the risks being taken by the creditors;

    n. The actual or projected value that can be obtained from avoidance actions;

    o. The existence, likelihood and possible sources of non-bankruptcy litigation; and

    p. The relationship of the debtor with any affiliates.

*In re Cardinal Congregate I,* 121 B.R. at 765; *In re Source Enters., Inc.,* 2007 LEXIS 4770, *7-8 (Bankr. S.D.N.Y. 2007); *In re Phoenix Petroleum Co.,* 278 B.R. 385, 393 (Bankr. E.D. Pa. 2001).

47.     There are numerous deficiencies in the Disclosure Statement for many of the categories of information identified above and, accordingly, the Debtor has failed to provide adequate information as required.

48.     First, the Debtor's Disclosure Statement does not discuss the general economic conditions and whether the current monetary climate will affect its operations and feasibility or will result in a need for further reorganization. Given the pervasive nature of the crash in the capital markets, the strong possibility of recession, and the lack of consumer confidence needed to book an elaborate affair, banquet or party that may be years in the making, this discussion should be foremost in the Disclosure Statement.

49.     Second, the Disclosure Statement and Plan must be clear and unequivocal that Bogota's treatment will be fair and equitable, and whether any unnecessary risk is being shifted to Bogota - particularly concerning the timing, circumstances and conditions of the Plan.

50.     Furthermore, it must be clear that Bogota's mortgage, liens, claims and security interests will be unaffected by confirmation of the Plan notwithstanding anything contained in the Disclosure Statement, Plan and in any proposed confirmation order.  Through the Plan, Bogota expects to receive a full cash payment, without discount, for the full amount owed on its secured claim by virtue of its loans documents and §506 (b) of the Bankruptcy Code governing the rights of an over-secured creditor.

51.     Third, the Debtor's Disclosure Statement does not discuss how Bogota's fully secured and matured loan can be reinstated, recast at a lower interest rate and extended with a five year maturity when such actions are contrary to both the loan documents and the law.

52.     Fourth, the Debtor is currently undergoing construction to serve as a catering facility, which construction is incomplete. The Borough of Totowa has not issued a permanent Certificate of Occupancy, which would allow the Debtor's business to open. The conditions for issuance of a permanent Certificate of Occupancy are comprehensive, and the Debtor should be required to demonstrate that it has the ability to meet those conditions, as well as to obtain the required approvals and sign offs within the timeline established by the Borough of Totowa.  The Debtor should also be required to provide a narrative and to discuss treatment of the substantial fines and penalties owed before the permanent Certificate of Occupancy will be issued.

53.     Fifth, although the Debtor anticipates opening for business and booking affairs in or about the third quarter of 2025, the Disclosure Statement is devoid of any discussion regarding how the Debtor will carry the property for 2025 and beyond; pay adequate protection to Bogota at the rate of twenty (20%) percent; pay real estate taxes, insurance and monthly operating expenses; or secure staffing and provisions while it ramps up business operations.

54.     Sixth, the Disclosure Statement does not disclose whether the Debtor has any banquet manager and staff, nor a book of business demonstrating that scheduled affairs and operations will commence in the near future. A start-up for this type of business typically will take years in the making, something that the Debtor is ill equipped to embark upon.

55.     Seventh, Debtor fails to include, for the full life of the Plan, all necessary financial information, cash flows, financial statements, sources and uses statements for confirmation, valuations and/or pro forma projections, and a preference and claims analysis which would be

13

relevant to each creditor's determination as to whether to accept or reject the Plan, as well as to

the evaluation of the risks being undertaken by the creditors with acceptance.

56.     Eighth, given the lack of transparency concerning affiliates, the terms and

availability of a bridge loan, as well as the paucity of information, it is unclear whether the Debtor

has the means and ability to consummate and perform under the Plan. Clearly, this should warrant

further disclosure.

57.     Such details must be shared with the Bankruptcy Court and creditors prior to any

determination being made regarding the Disclosure Statement. The Debtor has failed to provide

sufficient details to make an informed evaluation of the Disclosure Statement.

**b.     The Disclosure Statement Should Not be Approved Because
the Plan Violates the Law and is Unconfirmable.**

58.     A chapter 11 plan and disclosure statement cannot be sent out to creditors where

the Plan is unconfirmable as a matter of law and is not fair and equitable per §1129 of the

Bankruptcy Code. In *In re American Capital Equipment, LLC,* 688 F.3d 145 (3d Cir. 2012), the

Third Circuit held that a bankruptcy court may determine at the disclosure statement stage that a

proposed plan is unconfirmable without first holding a confirmation hearing. The Third Circuit

found that the Plan was patently unconfirmable because it did not meet the good faith requirement

of Section 1129(a)(3).

59.     The Chapter 11 Plan in this case is patently unconfirmable and does not meet the

good faith requirement of Section 1129(a)(3), *In re Granite Broad. Corp.*, 369 B.R. 120, 129

(Bankr. S.D.N.Y. 2007), since, among other things, the Debtor has failed to:

- provide full disclosure to the Bankruptcy Court and to creditors so that an
  informed evaluation of the Disclosure Statement and/or the Plan might be made
  including payment of the fines and penalties owing to the Township of Totowa;

- provide full disclosure to the Bankruptcy Court and to creditors and articulate how the Debtor can reinstate Bogota's secured loan and not provide immediate payment of the loan at the full contract rate (twenty percent (20%)) as provided for therein. See, *In re Golden Seahorse LLC,* 652 B.R. 593 (Bankr. S.D.N.Y. 2023); 11 U.S.C. § 506 (b). The same issue goes to feasibity as to whether the projections that attached are actually feasible as a threshold matter;

- provide full disclosure to the Bankruptcy Court and to creditors and articulate how the Debtor has determined the appropriate market interest rate and loan terms given a fully solvent Debtor and its complete absence of business operations in a difficult business environment involving a distressed business;

- provide full disclosure to the Bankruptcy Court and to creditors and articulate how the Debtor has exposed the Debtor's property and business to the market-place. See, *Bank of Am. Nat. Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434 (1999);

- provide full disclosure to the Bankruptcy Court and to creditors and articulate how the Debtor has satisfied the absolute priority rule given the value of its assets being casually disseminated and the value of the equity to be retained by insiders; and

- provide full disclosure to the Bankruptcy Court and to creditors and articulate how the Debtor and insiders are entitled to release and injunction provisions under the Plan which are unclear given that Bogota has a separate collection action against the Guarantors.  See, *Harrington v. Purdue Pharma L. P.*  603 U.S. 204 (2024).

60.    In addition, the Disclosure Statement and Plan must be clear that Bogota's mortgage, liens, claims and security interests will be unaffected by confirmation of the Plan and

15

revest notwithstanding anything contained in the Disclosure Statement, Plan and any proposed confirmation order.

**c.     Sufficient Time Should be Provided Between Approval of the Disclosure Statement and Confirmation of the Plan**

61.     It is incumbent upon the Debtor to present a viable business plan, which demonstrates how the Debtor will complete the project, secure a permanent Certificate of Occupancy, secure financing and begin generating cash flow to evidence that a Plan is actually in process.

62.     Accordingly, Bogota submits that sufficient time must be afforded between approval of the Disclosure Statement and confirmation of the Plan to allow Bogota to propound and receive discovery from the Debtor, including depositions, documents requests and interrogatories, as well as to retain experts, if necessary.

## JOINDER AND RESERVATION OF RIGHTS

63.     Bogota reserves the right, as appropriate, to supplement this objection prior to or at the hearing on the Disclosure Statement, to present such other objections following review of any response filed by the Debtor and further joins in and adopts any other objection filed by any other creditors or parties-in-interest in these proceedings.

## CONCLUSION

For the reasons set forth hereinabove, Bogota Savings Bank respectfully requests that the Court enter an Order: (i) sustaining the Objections filed by Bogota; (ii) denying approval of the Debtor's Disclosure Statement; and (iii) and granting such other and further relief as this Court deems just and proper under the circumstances.


Dated: April 10, 2025                          Respectfully submitted,

                                               **WILENTZ, GOLDMAN & SPITZER, P.A.**
                                               *Attorneys for Bogota Savings Bank*

                                               /s/ *David H. Stein*
                                                DAVID H. STEIN