| |
|---|
| UNITED STATES BANKRUPTCY COURT DISTRICT OF NEW JERSEY |
| **WILENTZ, GOLDMAN & SPITZER, P.A.**<br>90 Woodbridge Center Drive<br>Suite 900, Box 10<br>Woodbridge, NJ 07095<br>732-636-8000<br>DAVID H. STEIN, ESQ.<br>*Attorneys for Secured Creditor,*<br>*Bogota Savings Bank* |

| | |
|---|---|
| In re:<br><br>**FORTRESS HOLDINGS, LLC**,<br><br>                Debtor. | Case No.: 25-10977 (VFP)<br><br>Chapter 11<br><br>Hon. Vincent F. Papalia<br><br>Hearing Date: July 10, 2025<br>                at 11:00 a.m. |

**OBJECTION OF BOGOTA SAVINGS BANK TO THE ADEQUACY OF THE DEBTOR'S FIRST AMENDED DISCLOSURE STATEMENT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY**

Bogota Savings Bank ("Bogota"), by and through its counsel, Wilentz, Goldman & Spitzer, P.A., hereby files this Objection to the Adequacy of the First Amended Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code Describing Chapter 11 Plan (the "Amended Disclosure Statement") (Docket 146) proposed by Fortress Holdings, LLC (the "Debtor") under Chapter 11, Title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code") and states as follows:

## I.      BACKGROUND

### i.    Introduction

1.    On March 18, 2025 the Debtor filed an initial Disclosure Statement (Docket 66) which was soundly rejected by the Court as not providing adequate and accurate information regarding its

general business plan, treatment of creditor claims and financial projections and for failing to provide some demonstration that the Debtor has the necessary financial resources to begin operating. Now, with the presentation of the Amended Disclosure Statement, the Debtor has yet again failed to provide ""adequate information" … of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, … and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan." See, 11 U.S.C. §1125 (a) (1).

2.      In its rush to have a Chapter 11 Plan confirmed, the Debtor has presented an Amended Disclosure Statement which once again fails to provide creditors, including Bogota, with adequate information necessary to vote their claims.

3.      Initially, this retread of the disclosure statement does not set forth how the Bogota secured claim will be treated and satisfied; instead, it merely states that the Court will select an interest rate for the payment of the Bogota claim. As the Court is aware, the Bogota construction note is accruing interest at a rate of twenty (20.00%) percent per annum on a fully matured loan; however, the Debtor does not set forth any methodology by which Bogota should be compelled to accept less than this interest rate to which it is entitled.

4.      In addition, the Amended Disclosure Statement once again fails to provide even the very basic of adequate information required for confirmation. While Bogota is expected to accept less than the amount which it owed - since the Debtor estimates Bogota's claim at less than the filed amount - the Amended Disclosure Statement fails to address the absolute priority rule detailing how the Debtor's principals will retain a purported $20 million of equity while creditors are to receive less than that to which they are entitled.. For Bogota, in addition to the

2

$16.3 million which it is owed, as a fully secured creditor, Bogota is also owed additional interest, fees and costs as an over-secured creditor pursuant to 11 U.S.C. § 506 (b) of the Bankruptcy Code, a fact which the Amended Disclosure Statement fails to disclose or to address.

5.      Furthermore, if the Debtor's projections are to be believed, the Debtor, without any track record whatsoever, is projecting an operating profit, including an expense of $2,050,000 chargeable to the Debtor, of approximately 38%, which gets wiped out by the line item under other expenses (Liquor Expenses) of $2,457,000, which is approximately 38% of gross profit, yet it continues to project the slimmest of net profit of $22,267.

6.      The Debtor's projections are nothing more than numbers on a page given that the Debtor projects charging $150.00 a plate regardless of the day of the week, the type of event, or the month of the year.  The Debtor further projects having more than two hundred and ten (210) events, serving in excess of 65,000 plates over the next 12 months, while having a marketing budget of a mere $5,000 per month, while offering no incentives, and while having no reviews for the potential host of an event to review.

7.      Most bride and grooms book venues 12-18 months prior to the wedding. Track record and reviews are incredibly important for a wedding venue, such as the Debtor's facility, when a bride and her family are putting down $30,000 to $40,000 for an affair.  The Amended Disclosure Statement, however, does not address this concern, but rather makes projections commencing in October, 2025 with no consideration given to whether the Debtor can overcome the stigma, not only of the bankruptcy overlay, but of a complete absence of any operating experience relating to its venue or the operators.

8.    Among other things, the Debtor needs to present in the Amended Disclosure Statement a comprehensive and competent marketing program which would address the following deficiencies and which would garner the necessary reviews and positive publicity:

i.    Insight into Quality and Reliability: Reviews provide a glimpse into the actual experiences of couples who have used the venue before. Positive reviews can highlight their strengths, while negative reviews can point out potential problems to be aware of.

ii.    Setting Realistic Expectations: Reviews can offer a more complete picture than website photos or marketing materials alone, helping couples to understand what it's really like to work with the venue and what they can realistically expect on their wedding day.

iii.    Understanding Strengths and Weaknesses: Reviews can reveal a venue's specific strengths and weaknesses, such as areas where they excel or areas that might require extra planning or backup arrangements.

iv.    Building Trust: Positive reviews contribute to building trust and authenticity for a venue, making couples more confident in their decision to book there.

iv.    Considering the Overall Experience: Reviews can offer valuable insights into the venue's atmosphere, aesthetics, customer service, and the overall experience of having a wedding there.

9.    As the Court is aware, the Debtor's business involves the start-up of a new 80,000 square foot catering facility, which has no operational history, no staff and no banquet manager.  It also has no permanent certificate of occupancy, which must be granted by the Township of Totowa and which has not yet been issued given that construction at the Debtor's property is incomplete and on-going, including issues with relocation of utility poles, repairs of sidewalks and augmentation of air handlers.  Completion further requires issuance of all required governmental inspections and third-party approvals - including obtaining certification from a trusted kosher certification agency authorizing implementation of a separated Kosher kitchen facility, dishes, flatware, etc. dedicated for Jewish affairs.

10.    More importantly, and completely absent from the Amended Disclosure Statement, is any commitment, available funding source or glimmer of hope necessary to demonstrate that the Debtor

has available capital resources by which to open the operation, begin generating income as the Debtor

projects in October, 2025 and commence repaying the secured claim of Bogota, which exceeds $16.3

million as of Petition Date.  This scenario does not even take into consideration the necessity of the

Debtor having the ability to make regular insurance and real estate tax payments, thereby preventing the

creation of a situation wherein the Debtor does not have the necessary funds to make these bare minimum

payments, a situation which has already arisen, as evidenced by at-least two insurance cancelation notices

received during the course of this Chapter 11 proceeding.

11.     Furthermore, there has yet to be a resolution of $175,000 of open fines and penalties due

and owing by the Debtor to the Township of Totowa for unpaid Council on Affordable Housing

("COAH") fees in the amount of $135,000 and for unpaid penalties for stop work orders in the amount

of $40,000.00.

12.     In the backdrop of Debtor's failure to timely open its proposed catering business, the

absence of any banquet manager, the lack of bookings going into the future, the lack of operational

reserves by which to begin the process of scheduling affairs, and the lack of qualified staff (including

hosts), a kitchen manager, cooks, wait-staff, servers and a maintenance and a janitorial workforce that

have not been hired, the Debtor has now embarked on the filing of an ill-fated Amended Disclosure

Statement.

13.     From the outset, the Amended Disclosure Statement is doomed, given the lack of a

comprehensive business plan; the uncertainty of the economy, unpredictability affecting supply chain

costs, including food, fruits, produce, beverages, supplies and liquor, all of which are used in a catering

facility; and the predictions by most indicating the domestic economy has a significant chance of slipping

into recession in the near future[1]. These are the financial assumptions which the Debtor will need to overcome in convincing the Court that its unproven business is economically viable and feasible without the need for further reorganization into the future.

14.     Notwithstanding all of the aforementioned difficulties, the Debtor is attempting to commence a business as a luxury provider of catered celebrations and other affairs, while disposable income for brides and other potential clients is facing uncertainty based on the unknown economic impact of the global tariffs and the new tax bill. Given these uncertainties, the Amended Disclosure Statement should not be sent out to creditors without a thorough vetting and without a thorough discussion and disclosure regarding these concerns.

15.     Furthermore, and as more fully set forth below, Bogota is owed in excess of $16 Million from a fully matured loan which came due by its own terms in 2023 and which has been accruing interest pursuant to the terms of the loan documents at a rate of twenty (20%) percent.

16.     Given the absence of capital, income, and a cogent business model, coupled with an uncertain economy with reduced consumer confidence, the Debtor's Plan is inadequate and unrealistic and has no hope of success absent a sale to an experienced and well-capitalized operator and/or implementing refinance, options which the Debtor has not proposed.

### ii.      Relevant Procedural History

17.     On January 30, 2025 (the "Petition Date"), the Debtor filed a voluntary Chapter 11 Petition in the United States Bankruptcy for the District of New Jersey.

18.     No trustee or examiner has been appointed in these proceedings. The Debtor remains a debtor-in-possession and is operating its business pursuant to §§1107 and 1108 of the Bankruptcy Code.

---

[1]     https://www.marketwatch.com/story/jpmorgan-now-says-theres-a-60-chance-of-a-recession-after-tariff-hikes-a130b3e8

19.     The Debtor is a single asset real estate case pursuant to §§101 (51B) of the Bankruptcy Code, such that the Debtor is primary source of gross income is generated substantially from the ownership and operation of its real estate and the business located thereon.

20.     On March 18, 2025, the Debtor filed a Disclosure Statement (Docket No. 66). Also on March 18, 2025, the Debtor filed its Plan of Reorganization (the "Plan", Docket No. 67).

21.     On March 21, 2025, the Court entered an Order and Notice on Disclosure Statement (Docket No. 78), setting a hearing date to determine the adequacy of the Disclosure Statement for April 24, 2025 at 11:00 a.m.

22.     On April 4, 2025, Bogota properly and timely filed its Proof of Claim (Claim No. 6) in the amount of $16,363,366.35 as of the Petition Date. Interest, fees and costs will continue to accrue until the Proof of Claim is indefeasibly satisfied and paid in full.

23.     On February 10, 2025, the Debtor filed an Adversary Complaint to Determine the Nature, Extent and Validity of Liens Against Debtor's Assets (the "Adversary Proceeding", Docket No. 35). Bogota has been listed as a Defendant in the Adversary Proceeding.

24.     In response to the Adversary Proceeding, on April 2, 2025, Bogota filed a Motion In Lieu of Answer for Summary Judgment against the Debtor in the Adversary Proceeding. (Adversary Proceeding, Docket No. 8).

25.     On June 25, 2025, the Court entered an Order Granting Motion for Summary Judgment in lieu of answer in favor of Defendant, Bogota Savings Bank and against Plaintiff, Fortress Holdings, LLC deeming that Bogota had a fully secured claim against the Debtor and dismissed the adversary proceeding against the bank. (Adversary Proceeding, Docket No. 31).  Among other things, the Court found that as of January 30, 2025, Bogota's secured claim against the Debtor and the Debtor's estate totaled no less than $15,888,916.64, which secured claim includes $10,893,713.00 in unpaid principal;

$14,372.74 in unpaid interest; $4,799,285.78 in default rate interest; and $181,545.12 in late charges and that all other claims for recovery of real estate taxes, force-placed insurance, appraisal costs, pre-petition legal fees, interest on escrow/advances, exit fees and all other out of pocket costs and advances including those arising under the loan documents and 11 U.S.C. § 506 (b).

### iii.    The Secured Loan with Bogota

26.    On August 11, 2021, the Debtor, being indebted to Bogota in the sum of up to $11,000,000.00 (the "Construction Loan"), executed a Mortgage Note (the "Note") of that date to secure that sum.  The Loan was a non-revolving Construction Loan, converting to a Permanent Loan upon satisfaction of certain conversion conditions.

27.    The terms of the Construction Loan included a provision for an escrow of interest (the "Interest Reserve").  Said Interest Reserve has been depleted with a current zero balance.

28.    The Note provided that the term for the Construction Loan (the "Construction Loan Term") would commence on the loan closing date and would end on the first day of the 19th full month thereafter (the "Construction Loan Maturity Date"), at which time the entire principal amount of the Construction Loan, plus unpaid interest, fees, and other amounts and charges payable in connection with the Loan would be due and payable.

29.    Notwithstanding the foregoing, the Debtor had the option to extend the Construction Loan Term for a period of six (6) months, interest only, subject to approval by Bogota.

30.    The Note further provided that conversion to the Permanent Loan would be subject to the following conditions (the "Conversion Conditions"):

(a)    Completion of the Project;
(b)    Issuance of an unconditional Final Certificate of Occupancy and submission of a completed as-built survey certified to the Lender;

8

(c)      A Minimum Debt Service Coverage Ratio ("DSCR") of 1.25% on a pro forma basis for the Permanent Loan Term; and

(d)      A maximum loan-to-value of 65%.

31.      The Note further provided that, from the commencement of the Loan Term, the Debtor would pay interest in arrears on the unpaid principal amount as follows:

(a)      During the construction period, interest shall accrue on the outstanding principal balance of the loan at a rate of Lender's Prime Rate plus 1.625% with a floor of 4.875%.

(b)      The Annual Percentage Rate would be variable and might change each billing cycle.

32.      In addition, the Note provided that the first monthly payment of interest only, plus 1/12 of the annual real estate taxes, would be made on the first day of the first full calendar month following the Construction Loan closing. Thereafter, monthly payments of interest and 1/12 of the annual real estate taxes would be made on the first day of each successive calendar month and applied to interest only for the Construction Term.

33.      The Note further provided that, if the Debtor satisfied the Conversion Conditions, then the Construction Loan would convert to a Permanent Loan on the Construction Loan Maturity Date. In that event, the Debtor would make 60 fixed monthly payments of principal and interest, plus 1/12th of the annual real estate taxes.  Permanent financing interest would accrue on the outstanding principal balance of the Permanent Loan at a rate equal to 5-year FHLBNY rate plus three percent (3.0%) per annum (the "Interest Rate"), rounded up to the nearest 1/8%, with a floor of four percent (4.0%).

34.      The Note further provided that, in the event that the Conversion Conditions were not met, the outstanding principal balance of the Construction Loan, plus all accrued interest and any other charges outstanding, would be due and payable to Bogota on the Construction Loan Maturity Date.

35.    The Note further provided that, if Bogota did not receive any monthly payment within ten (10) days of its due date, then for each such late payment the Debtor would pay a late charge of eight (8.00%) percent of the unpaid amount.

36.    In addition, the Note provided that, in the event of any default under the Note or under the loan documents, interest as of the date of default would accrue on the unpaid balance of the loan at a rate equal to the lesser of twenty (20.00%) percent per annum or the highest rate permitted by law (the "Default Rate").

37.    Paragraph 13 of the Note provided for the establishment of an Interest Reserve Account as follows:

> During the term of the loan, Borrower agrees to establish and maintain prior to or at closing an Interest Reserve Account with an initial deposit of $730,000. During the construction loan term, if and when the Interest Reserve Account balance is reduced to $80,000, Borrower shall replenish the Interest Reserve Account, as part of Borrower's Equity Contribution, in an amount determined by the Bank to be sufficient to cover interest payments for the remaining Construction Loan Term. Monthly payments of interest will be debited from the Interest Reserve Account during the Construction Period. Borrower shall also continue to maintain operating account #2000050837 for construction advances during the construction period. Said account(s) shall be established prior to or at the time of closing of the Loan.

38.    As security for the payment of the Note, the Debtor gave a Construction Mortgage and Security Agreement (the "Mortgage") to Bogota of even date with the Note covering the property (the "Premises") owned by the Debtor at:

> Address:        555 PREAKNESS AVENUE
> Municipality: TOTOWA
> County & State: PASSAIC, NJ
> Lot & Block:  LOT 2, BLOCK 6
>
> Address:        561 PREAKNESS AVENUE
> Municipality: TOTOWA
> County & State: PASSAIC, NJ
> Lot & Block:  LOT 4, BLOCK 6

> Address:        322-324 BERKSHIRE AVENUE
> Municipality: PATERSON/TOTOWA
> County & State: PASSAIC, NJ
> Lot & Block:  LOT 12, BLOCK 6, TOTOWA
> LOT 18, BLOCK 1218, PATERSON

39.    Said Mortgage was duly recorded in the Office of the Clerk of Passaic County on August 12, 2021, in Book M17358 of Mortgages for said County at Page 45. According to a real property title search, the Mortgage is secured as a priority first lien on the Premises.

40.    To further secure the Note, the Debtor executed an Absolute Assignment of Leases and Rents (the "Assignment of Rents") dated of even date with the Note and recorded in the Office of the Clerk of Passaic County on August 12, 2021 in Book 17358, Page 75.

41.    To further evidence its indebtedness under the Construction Loan, and as additional security for the payment of the Note, the Debtor granted Bogota a continuing security interest in and lien upon the Debtor's right, title and interest in all fixtures and articles of the Debtor then or thereafter attached to or used in connection with, or with the operation of, the Premises (the "Collateral").

42.    On or about August 12, 2021, Bogota perfected its security interest in the Collateral by recording a UCC-1 Financing Statement (the "County UCC-1") in the Office of the Clerk of Passaic County as File Number 104993, Instrument Number 2021051970.

43.    On or about August 2, 2021, Bogota perfected its security interest in the Collateral by filing a UCC-1 Financing Statement (the "State UCC-1") with the State of New Jersey Department of the Treasury, Division of Revenue & Enterprise Services, Filing Number 55357210.

44.    Also on August 11, 2021, to further induce Bogota to provide the Construction Loan, the Debtor executed a Security Agreement in favor of Bogota (the "Security Agreement").

45.    The Security Agreement granted Bogota a security interest in all of the Debtor's property as described therein, together with all the equipment, parts, appliances, accessions, appurtenances, proceeds and products therefrom presently or thereafter located at the Premises.

46.    Also on August 11, 2021, to further induce Bogota to provide the Construction Loan, the Debtor executed a Construction Loan Agreement in favor of Bogota (the "Construction Loan Agreement").  The Construction Loan is personally guaranteed by Paul Qassis and Majid Krikor (together, the "Guarantors").

47.    The Construction Loan matured by its own terms on March 1, 2023 and the Debtor is in default of its obligations owing to Bogota.  In addition, the Debtor failed to complete construction of the project as required by the Construction Loan documents.

48.    On September 14, 2023, Bogota issued a notice to the Debtor and the Guarantors (the "Default Notice"), advising that the subject loan was in default and that such default was required to be cured by October 14, 2023.

### iv.    Basis for Objection

49.    As more fully set forth herein, based upon the absence of full and adequate disclosure, the Court should not approve the Amended Disclosure Statement, nor should it allow the Amended Disclosure Statement and Plan to be sent out to creditors given the legal infirmities involving the treatment of Bogota's secured loan, for which the Debtor seeks reinstatement despite the fact that the loan has fully matured and is accruing interest at a rate of twenty (20%) percent per annum.

## II.   LEGAL ARGUMENT

**a.   The Amended Disclosure Statement Should Not be Approved Because it Does Not Contain Adequate Information.**

50.   The Bankruptcy Code requires that every disclosure statement submitted to creditors provide the following**:**

> "adequate information" means information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan, but adequate information need not include such information about any other possible or proposed plan and in determining whether a disclosure statement provides adequate information, the court shall consider the complexity of the case, the benefit of additional information to creditors and other parties in interest, and the cost of providing additional information.

> See, 11 U.S.C. §1125 (a) (1).

51.   Proper disclosure is "the pivotal concept in reorganization procedure under the Code." *Oneida Motor Freight, Inc. v. United Jersey Bank (In re Oneida Motor Freight, Inc.),* 848 F.2d 414, 417 (3d Cir. 1988); *In re Crowthers McCall Pattern, Inc.,* 120 B.R. 279, 300 (Bankr. S.D.N.Y. 1990).

52.   "The importance of full disclosure is underlaid by the reliance placed upon the disclosure statement by the creditors and the court. Given this reliance, we cannot overemphasize the debtor's obligation to provide sufficient data to satisfy the Code standard of 'adequate information.'" *In re Oneida Motor Freight, Inc.,* 848 F.2d at 417. "[T]he importance of full and honest disclosure cannot be overstated." *Ryan Opers., G.P. v. Santiam Midwest Lumber Co.,* 81 F.3d 355, 362 (3d Cir. 1996).

53.    In order to receive Bankruptcy Court approval, the disclosure statement must contain "adequate information" about the debtor, the bankruptcy case, and the plan.  11 U.S.C. § 1125(a)(1).  Section 1125 of the Bankruptcy Code defines "adequate information" to mean "information of a kind, and in sufficient detail . . . that would enable a hypothetical investor of the relevant class to make an informed judgment about the plan . . . ."  11 U.S.C. § 1125(a)(1). *See also In re Lower Bucks Hosp.*, 488 B.R. 303, 317 (E.D. Pa. 2013), *aff'd*, 571 F. App'x 139 (3d Cir. 2014); *In re Congoleum Corporation*, 636 B.R. 362, 383 (Bankr. D.N.J., 2022).

54.    Whether a disclosure statement contains "adequate information" is governed by a flexible standard and is to be determined by the bankruptcy court on a case-by-case basis.  *In re Oneida Motor Freight, Inc.,* 848 F.2d at 417; In *re River Village Assocs.,* 181 B.R. 795, 804 (E.D. Pa. 1995).  "What constitutes 'adequate information' is determined on a case-by-case basis, with the ultimate determination within the discretion of the bankruptcy court." *In re Lower Bucks Hosp.*, 488 B.R. at 317 (citing *In re Texas Extrusion Corp*., 844 F.2d 1142, 1156–57 (5th Cir.1988)); *In re Congoleum Corporation*, 636 B.R. 362, 383 (Bankr. D.N.J., 2022).

55.    The "adequate information" standard requires a plan proponent to include in a disclosure statement all information that would enable holders of claims to take an informed position on the proposed reorganization plan.  *Sure-Snap Corp. v. State Street Bank & Trust Co.,* 948 F.2d 869, 873 (2d Cir. 1991).

56.    "Generally, a disclosure statement must contain all pertinent information bearing on the success or failure of the proposals in the plan of reorganization." *In re Cardinal Congregate I,* 121 B.R. 760, 765 (Bankr. S.D. Ohio 1990); *In re Stanley Hotel, Inc.,* 13 Bankr. 926, 929 (Bankr. D. Colo. 1981). "A disclosure statement should likewise contain all material information relating to the risks posed to creditors and equity interest holders under the proposed

14

plan of reorganization." Id. at 765. "The disclosure statement must contain information that is material, important and necessary for creditors and shareholders to properly evaluate a proposed plan and thus enable the creditors and shareholders to make a reasonably informed decision on the plan." *In re William F. Gable Co.,* 10 B.R. 248, 249 (Bankr. N.D. W. Va. 1981).

57.    "A plan is necessarily predicated on knowledge of the assets and liabilities being dealt with and on factually supported expectations as to the future course of the business. . . ." *Century Glove, Inc. v. First Am. Bank of N.Y.,* 860 F.2d 94, 100 (3d Cir. 1988) (internal quotation marks omitted).

58.    Moreover, courts have set forth a non-exclusive list of the type of information which should be included in a disclosure statement:

a.   The circumstances that gave rise to the filing of the bankruptcy petition;

b.   A complete description of the available assets and their value;

c.   The anticipated future of the debtor;

d.   The source of the information provided in the disclosure statement;

e.   The condition and performance of the debtor while in Chapter 11;

f.   Information regarding claims against the estate;

g.   A liquidation analysis setting forth the estimated return that creditors would receive under Chapter 7;

h.   The accounting and valuation methods used to produce the financial information in the disclosure statement;

i.   Information regarding the future management of the debtor, including the amount of compensation to be paid to any insider, directors, and/or officers of the debtor;

j.   A summary of the plan of reorganization;

k.   The collectability of any accounts receivable;

l.   Any financial information, valuations or pro forma projections that would be relevant to creditors' determinations of whether to accept or reject the plan;

      m. Information relevant to the risks being taken by the creditors;

      n. The actual or projected value that can be obtained from avoidance actions;

      o. The existence, likelihood and possible sources of non-bankruptcy litigation; and

      p. The relationship of the debtor with any affiliates.

*In re Cardinal Congregate I,* 121 B.R. at 765; *In re Source Enters., Inc.,* 2007 LEXIS 4770, *7-8 (Bankr. S.D.N.Y. 2007); *In re Phoenix Petroleum Co.,* 278 B.R. 385, 393 (Bankr. E.D. Pa. 2001).

59.    There are numerous deficiencies in the Amended Disclosure Statement for many of the categories of information identified above and, accordingly, the Debtor has failed to provide adequate information as required.

60.    First, the Debtor's Amended Disclosure Statement does not discuss the general economic conditions and whether the current monetary climate will affect its operations and feasibility or will result in a need for further reorganization. Given the pervasive nature of a crash in the capital markets, the strong possibility of recession, and the lack of consumer confidence needed to book an elaborate affair, banquet or party that may be years in the making, this discussion should be foremost in the Amended Disclosure Statement.

61.    Second, the Amended Disclosure Statement and Plan must be clear and unequivocal that Bogota's treatment will be fair and equitable, and whether any unnecessary risk is being shifted to Bogota - particularly concerning the timing, circumstances and conditions of the Plan.

62.    Furthermore, it must be clear that Bogota's mortgage, liens, claims and security interests will be unaffected by confirmation of the Plan notwithstanding anything contained in the Amended Disclosure Statement, Plan and in any proposed confirmation order.  Through the Plan, Bogota expects to receive a full cash payment, without discount, for the full amount owed

on its secured claim by virtue of its loans documents and §506 (b) of the Bankruptcy Code governing the rights of an over-secured creditor.

63.    Third, the Debtor's Amended Disclosure Statement does not discuss how Bogota's fully secured and matured loan can be reinstated, recast at a lower interest rate and extended with a five year maturity when such actions are contrary to both the loan documents and the law.

64.    Fourth, the Debtor is currently undergoing construction to serve as a catering facility, which construction is incomplete. The Borough of Totowa has not issued a permanent Certificate of Occupancy, which would allow the Debtor's business to open. The conditions for issuance of a permanent Certificate of Occupancy are comprehensive, and the Debtor should be required to demonstrate that it has the ability to meet those conditions, as well as to obtain the required approvals and sign offs within the timeline established by the Borough of Totowa.  The Debtor should also be required to provide a narrative and to discuss treatment of the substantial fines and penalties owed before the permanent Certificate of Occupancy will be issued.

65.    Fifth, although the Debtor anticipates opening for business and booking affairs in or about October, 2025, the Amended Disclosure Statement is devoid of any discussion regarding how the Debtor will carry the property for 2025 and beyond; pay adequate protection to Bogota at the rate of twenty (20%) percent; pay real estate taxes, insurance and monthly operating expenses; or secure staffing and provisions while it ramps up business operations.

66.    Sixth, the Amended Disclosure Statement does not disclose whether the Debtor has any Chef, Banquet Manager, Marketing Manager or staff, nor a book of business demonstrating that scheduled affairs and operations will commence in the near future. A start-up

for this type of business typically will take years in the making, something upon which the Debtor

is ill equipped to embark.

67.    Seventh, Debtor fails to include, for the full life of the Plan, all necessary financial

information, cash flows, financial statements, sources and uses statements for confirmation,

valuations and/or pro forma projections on a monthly basis, and a preference and claims analysis

which would be relevant to each creditor's determination as to whether to accept or reject the

Plan, as well as to the evaluation of the risks being undertaken by the creditors with acceptance.

68.    Eighth, given the lack of transparency concerning affiliates, as well as the paucity

of information, it is unclear whether the Debtor has the means and ability to consummate and

perform under the Plan. Clearly, this should warrant further disclosure.

69.    Such details must be shared with the Bankruptcy Court and creditors prior to any

determination being made regarding the Amended Disclosure Statement. The Debtor has failed

to provide sufficient details to make an informed evaluation of the Amended Disclosure

Statement.

### b.    The Amended Disclosure Statement Should Not be Approved Because the Plan Violates the Law and is Unconfirmable.

70.    A chapter 11 plan and disclosure statement cannot be sent out to creditors where

the Plan is unconfirmable as a matter of law and is not fair and equitable per §1129 of the

Bankruptcy Code. In *In re American Capital Equipment, LLC,* 688 F.3d 145 (3d Cir. 2012), the

Third Circuit held that a bankruptcy court may determine at the disclosure statement stage that a

proposed plan is unconfirmable without first holding a confirmation hearing. The Third Circuit

found that the Plan was patently unconfirmable because it did not meet the good faith requirement

of Section 1129(a)(3).

71.      The Chapter 11 Plan in this case is patently unconfirmable and does not meet the

good faith requirement of Section 1129(a)(3), *In re Granite Broad. Corp*., 369 B.R. 120, 129

(Bankr. S.D.N.Y. 2007), since, among other things, the Debtor has failed to:

- provide full disclosure to the Bankruptcy Court and to creditors and articulate how the appropriate market interest rate and loan term for the Bogota secured loan will be determined given that the Debtor is presented as fully solvent;

- provide full disclosure to the Bankruptcy Court and to creditors in the form of accurate financial projections should the interest rate afforded to Bogota secured loan be fixed at twenty (20%) percent per annum;

- provide full disclosure to the Bankruptcy Court and to creditors demonstrating sources of cash on hand to fund the Debtor's Plan and to fund ongoing operations;

- provide full disclosure to the Bankruptcy Court and to creditors and articulate how the Debtor can reinstate Bogota's secured loan and not provide immediate payment of the secured loan at the full contract rate (twenty percent (20%)) as provided for therein. See, *In re Golden Seahorse LLC,* 652 B.R. 593 (Bankr. S.D.N.Y. 2023); 11 U.S.C. § 506 (b).

- provide full disclosure to the Bankruptcy Court and to creditors and articulate how the Debtor can demonstrate through actual assumption: i) how the projections that are attached to the Disclosure Statement are actually feasible as a threshold matter, given that the repayment terms on Bogota secured debt are unreasonable and the interest of 7.5% provided to Bogota makes no sense; ii) that its operations will commence October 1, 2025; iii) an explanation regarding the sources of over $2 million of funding from Golden Sky Chariot LLC, a company which may be non-operational; and iv) an explanation as to why the Effective Date is delayed in the projections yet the Debtor projects commencing business operations in October, 2025 consisting of 3 events per week, for 200 guests per event @ $150.00 per plate with no Chef, no Banquet Manager, no Marketing Manager, and no staff and with only $5,000 per month earmarked for marketing expenses of a $10 million per year operation without any operational history whatsoever, no clientele, no bookings, etc. In addition, the Debtor should be required to disclose and attach the contracts and/or resumes for the Chef, Banquet Manger and Marketing Manager;

- provide full disclosure to the Bankruptcy Court and to creditors and articulate how the Debtor has exposed the Debtor's property and business to the market-place and satisfied the "absolute priority rule," which requires that, if the holders of claims in a particular class receive less than full value for their claims, no holders of claims or interests in a junior class may receive any property under the plan.

See *Bank of Am. See, Bank of Am. Nat. Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434 (1999);

- provide full disclosure to the Bankruptcy Court and to creditors and articulate how Bogota's Section 506 (b) claim will be paid;

- provide full disclosure to the Bankruptcy Court and to creditors so that an informed evaluation of the Amended Disclosure Statement and/or the Plan might be made, including payment of the fines and penalties owing to the Township of Totowa;

- provide full disclosure to the Bankruptcy Court and to creditors and articulate how the Debtor and insiders are entitled to any general injunction, general release and exculpation under the Plan which are not permissible given that Bogota has a separate collection action against the Guarantors.  See, *Harrington v. Purdue Pharma L. P.*  603 U.S. 204 (2024);

- provide full disclosure to the Bankruptcy Court and to creditors and articulate whether any preference analysis has been performed and the value of same, including the Debtor's interest in the exotic automobile disclosed in its Schedules;

- provide full disclosure to the Bankruptcy Court and to creditors and articulate how Balcony Holdings, LLC, an entity owned by Paul Quasis, a member of the Debtor, will contribute outright its plenary retail consumption liquor license to the Debtor, its historical background, whether the transfer is irrevocable, whether the transfer is permitted by New Jersey State law, the value of the liquor license, whether corporate and regulatory action is required, whether that entity has creditors of its own and make full disclosure in the form of a balance sheet showing assets, liabilities and financial information showing liquidity, liens and debts. In addition, the Debtor should attach to the Amended Disclosure Statement the actual document in which Mr. Quasis has agreed to pledge his interest in Balcony Holdings, LLC to fund, guarantee, contribute assets and cover the obligations under the Plan;

- provide full disclosure to the Bankruptcy Court and to creditors and articulate how Golden Sky Chariot, LLC, yet another entity owned by Paul Quasis, a member of the Debtor, will enter into an operating agreement with the Debtor to run its restaurant and catering facility having a value of $45 million, its historical background and operating experience, its business terms, its business assets, whether that entity has creditors of its own, a balance sheet showing assets, liabilities and financial information showing liquidity, liens and debts and the source of funds that are being contributed to the Debtor on a monthly basis, the source of funds that Golden Sky Chariot, LLC will contribute to the Debtor to cover all obligations of the Plan and all operational expenses of the real estate. in addition, the Amended Disclosure Statement should attach a copy of the management and/or operating agreement, which should include the undertaking

in which Mr. Quasis has agreed to pledge his interest in Golden Sky Chariot, LLC to fund, guarantee, contribute assets and cover the obligations under the Plan;

- provide full disclosure to the Bankruptcy Court and to creditors and articulate why the claims of Herc Rentals Inc., Samma Construction & Steel Fabrication and Sherwin Williams Co. are classified separately from Class 7 unsecured creditors;

72.    In addition, the Amended Disclosure Statement and Plan must be clear that Bogota's mortgage, liens, claims and security interests will be unaffected by confirmation of the Plan and revest notwithstanding anything contained in the Amended Disclosure Statement, Plan and any proposed confirmation order.

**c.    Sufficient Time Should be Provided Between Approval of the Amended Disclosure Statement and Confirmation of the Plan**

73.    It is incumbent upon the Debtor to present a viable business plan, which demonstrates how the Debtor will complete the project, secure a permanent Certificate of Occupancy, secure financing and begin generating cash flow to evidence that a Plan is actually in process.

74.    Accordingly, Bogota submits that sufficient time must be afforded between approval of the Amended Disclosure Statement and confirmation of the Plan to allow Bogota to propound and receive discovery from the Debtor, including depositions, documents requests and interrogatories, as well as to retain experts, if necessary.

**III.    JOINDER AND RESERVATION OF RIGHTS**

75.    Bogota reserves the right, as appropriate, to supplement this objection prior to or at the hearing on the Amended Disclosure Statement, to present such other objections following review of any response filed by the Debtor and further joins in and adopts any other objection filed by any other creditors or parties-in-interest in these proceedings.

## IV.    <u>CONCLUSION</u>

For the reasons set forth hereinabove, Bogota Savings Bank respectfully requests that the Court enter an Order: (i) sustaining the Objections filed by Bogota; (ii) denying approval of the Debtor's Amended Disclosure Statement; and (iii) and granting such other and further relief as this Court deems just and proper under the circumstances.

Dated: July 8, 2025                              Respectfully submitted,

**WILENTZ, GOLDMAN & SPITZER, P.A.**
*Attorneys for Bogota Savings Bank*

/s/ *David H. Stein*_____
DAVID H. STEIN